UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LAUREL ZUCKERMAN, AS ANCILLARY
ADMINISTRATRIX OF THE ESTATE OF
ALICE LEFFMANN,

Plaintiff,

v.

THE METROPOLITAN MUSEUM OF ART,

Defendant.


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2-7-18

16 Civ. 7665 (LAP)

OPINION

LORETTA A. PRESKA, Senior United States District Judge:

This is an action by Laurel Zuckerman, the Ancillary
Administratrix of the estate of Alice Leffmann (the sole heir of
Paul Friedrich Leffmann) (the "Leffmann estate"), to recover
from New York's Metropolitan Museum of Art (the "Museum") a
monumental work by Pablo Picasso entitled "The Actor," 1904-
1905, oil on canvas, 77 1/4 x 45 3/8 in., signed lower right
Picasso ("The Actor")(the "Painting"), which was owned by Paul
Friedrich Leffmann ("Leffmann"), a German Jew, from
approximately 1912 until 1938.

In 1937, Alice and Paul Leffmann (the "Leffmanns") fled
from Germany to Italy in fear for their lives, after losing
their business, livelihood, home, and most of their possessions
due to Nazi persecution.  In 1938, while living in Italy, the

Leffmanns sold the Painting at a price well below its actual value in an effort to gather enough money to pay for passage out of Italy, which itself had become a perilous place for the Leffmanns to remain. The Museum received the Painting as a donation in 1952 and has possessed it since that time.

Plaintiff, the great-grandniece of Paul and Alice Leffmann, received Ancillary Letters of Administration CTA for the estate of Alice Leffmann from the Surrogate's Court of the State of New York, New York County, on October 18, 2010. Pursuant to 28 U.S.C. § 1332(c)(2), because Alice Leffmann was a Swiss domiciliary, the Ancillary Administratrix is deemed to be a citizen of Switzerland as well.

In this diversity suit, Plaintiff seeks replevin of the Painting, $100 million in damages for conversion, and a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 declaring the Leffmann estate as the sole owner of the Painting on the grounds that good title never passed to the Museum, inter alia, because the 1938 sale of the Painting was void for duress under Italian law. (See Amended Compl. ("Am. Compl."), dated Nov. 2, 2016 [dkt. no. 8], ¶¶ 68-82.)

Defendants move to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) on the following grounds: (1) lack of standing; (2) failure to allege duress under New York or Italian law; (3) ratification of the transaction; (4) the Museum

received good title from a good-faith purchaser; (5) Plaintiff's claims are time-barred under the statute of limitation and laches. (See Mem. of Law in Supp. of Def. Mot. to Dismiss, ("Def. Mot."), dated Nov. 30, 2016 [dkt. no. 12].) For failure to allege duress under New York law, the motion to dismiss is granted.

## I.    BACKGROUND

The following facts are accepted as true for the purposes of this motion. In 1912, the Leffmanns purchased the Painting, which was one of their most valuable acquisitions. (See Am. Compl. ¶ 9.) From 1912 until at least 1929, the Leffmanns presented the Painting at a variety of exhibitions in Germany, where they were identified as the owners of the Painting. The Painting was also featured in newspaper articles, magazines, and monographs. (See id.)

During this time and until the start of the Nazi period, Paul and Alice, German Jews, lived in Cologne, Germany. They had sizeable assets, including Atlantic Gummiwerk, a rubber manufacturing company that was one of the leading concerns of its kind in Europe, which Paul co-owned with Herbert Steinberg; real estate investment properties in Cologne (Hohenzollernring 74 and Friesenwall 77); and their home located at Haydnstrasse 13, Köln-Lindenthal. The Leffmanns' home included a collection

of Chinese and Japanese artifacts and other artworks, including the masterwork by Pablo Picasso that is the subject of this action. (See id. ¶ 10.)

Beginning in 1933, the world the Leffmanns knew in Germany began to change dramatically. Adolf Hitler came to power, and racist laws directed against Jews were quickly enacted and enforced, leading to the adoption of the Nuremberg Laws ("The Laws for the Protection of German Blood and German Honor") on September 15, 1935. The Nuremberg Laws deprived all German Jews, including Paul and Alice, of the rights and privileges of German citizenship, ended any normal life or existence for Jews in Germany, and relegated all Jews to a marginalized existence. (See id. ¶ 11.)

The Nuremberg Laws formalized a process of exclusion of Jews from Germany's economic and social life. It ushered in a process of eventual total dispossession through what became known as "Aryanization" or "Arisierung," first through takeovers by "Aryans" of Jewish-owned businesses and then by forcing Jews to surrender virtually all of their assets. Through this process all Jewish workers and managers were dismissed, and businesses and corporations belonging to Jewish owners were forcibly transferred to non-Jewish Germans, who "bought" them at prices officially fixed and well below market value. As a result, the number of Jewish-owned businesses in Germany was

4

reduced by approximately two-thirds from April 1933 to April 1938. By that time, the Nazi regime moved to the final phase of dispossession, first requiring Jews to register all of their domestic and foreign assets and then moving to possess itself of all such assets. (See id. ¶ 12.)

On September 16, 1935, the Leffmanns were forced to sell their home to an Aryan German corporation, Rheinsiche Braunkohlensyndikats GmbH Köln. On December 19, 1935, Leffmann and his Jewish partner, Herbert Steinberg, were forced to transfer ownership of Atlantic Gummiwerk to Aloys Weyers (their non-Jewish minority business partner). On July 27, 1936, the Leffmanns were forced to sell all of their real estate investments to Feuerversicherungsgessellschaft Rheinland AG, another Aryan German corporation. In return, the Leffmanns had no choice but to accept only nominal compensation. Indeed, these were not real sales at all but essentially thefts by Nazi designees of substantially everything the Leffmanns ever owned. (See id. ¶ 12.) Some time prior to their departure from Germany, Paul and Alice had arranged for The Actor to be held in Switzerland by a non-Jewish German acquaintance, Professor Heribert Reiners. Reiners kept The Actor in his family home in Fribourg, where it remained for its entire stay in Switzerland. For this reason only, The Actor was saved from Nazi confiscation. (See id. ¶ 13.)

Paul and Alice, like so many other German Jews, found themselves faced with the threat of growing violence, the risk of imprisonment, and possibly deportation and death. Thus, to avoid the loss of the property they had left—and potentially their lives—they began planning their flight from Germany, liquidating their remaining assets in Germany to enable them to survive and escape. (See id. ¶ 15.) The Leffmanns fled Germany in the spring of 1937. By that time, the Nazi regime had already put in place its ever-tightening network of taxes, charges, and foreign exchange regulations designed to arrogate Jewish-owned assets to itself. Emigrants were only able to leave with a tiny fraction of their assets. Consequently, upon their escape from the Reich, the Leffmanns had been dispossessed of most of what they once owned. (See id. ¶ 16.)

One measure by which the Reich seized assets from fleeing Jews was the flight tax. Flight tax assessments were based on wealth tax declarations, which referred to wealth in the previous year and which were calculated at 25 percent of the value of the reported assets. Payment of the flight tax did not give the emigrant any right whatsoever to transfer abroad any of the remaining assets after payment of the tax. In fact, the flight tax amount typically would have been considerably higher than 25 percent of the assets actually owned at the time of emigration, as those who were persecuted by the Nazis—such as

the Leffmanns—suffered dramatic financial losses in the period leading up to their emigration, so that their assets at the time of emigration would have been considerably smaller than those on which their flight tax was assessed. The payment of the flight tax was necessary to obtain the no-objection certification of the tax authorities, which in turn was necessary to obtain an exit permit. In the case of the Leffmanns, the flight tax was thus calculated at 25 percent of the assets they reported on their 1937 tax form, which would have included their total assets held in 1936. The Leffmanns paid this flight tax in the amount of 120,000 to 125,000 Reichsmark ("RM") in cash. (See id. ¶ 19.)

The Leffmanns would have preferred neutral Switzerland to Italy, as Italian Fascists were already in power and close relations with Nazi Germany had begun to develop. However, a long-term stay in Switzerland would have been virtually impossible. Italy, as opposed to Switzerland, was one of the few European countries still allowing the immigration of German Jews. So that is where the Leffmanns went, hoping that Italy's significant Jewish population would provide a safe haven from the Nazi onslaught. (See id. ¶ 20.) In light of the ever-tightening regulations governing the transfer of assets, emigrants sought alternative means of moving their funds abroad. One major avenue involved creating a triangular agreement

whereby individuals who owned property outside the Reich and were in need of RM would agree to exchange the currency for property, which they would then immediately liquidate upon arrival in the new country. This is exactly the type of transaction the Leffmanns took part in when, in December 1936, they purchased a house and factory in Italy for an inflated price of RM 180,000 from the heirs of Eugenio Usenbenz from Stuttgart. The Leffmanns pre-agreed to sell the property back to a designated Italian purchaser for lire at a considerable loss upon their arrival in Italy a few months later. (See id. ¶ 21.)

In April 1937 the Leffmanns crossed the border into Italy, going first to Milan and then to Florence, where their newly acquired house and factory were located. (See id. ¶ 22.) Shortly after their arrival in Italy, as pre-agreed, the Leffmanns sold their newly-acquired properties to an Italian businessman named Gerolamo Valli, who was a business partner of the family from Stuttgart from whom they had originally purchased the house and factory. They sold the properties at a considerable loss—for 456,500 Lira (or about 61,622 RM)—and rented a home in Florence at Via Terme 29 and later at Via di San Vito 10. (See id. ¶ 23.)

The Leffmanns' time in Italy was short-lived. It soon became clear that the persecution from which they had fled in

Germany was encroaching upon them in Italy as well. Moving once more meant yet again losing a significant part of their remaining financial assets. The Leffmanns had already lost two-thirds of their initial RM investment in transfer costs, and they now stood to lose much of their remaining cash proceeds as the tight Italian foreign exchange restrictions forced them to seek conversion in "unofficial" ways. Paul was in his late sixties when they arrived in Italy; Alice was six years younger. They were living as refugees, unable to work in Italy, their prior lives destroyed by Nazi persecution, and on the run. (See id. ¶ 24.)

In April 1936, Italy and Germany had secretly adopted the Italo-German Police Agreement. The agreement provided for the exchange of information, documents, evidence, and identification materials by the police with regard to all emigrants characterized as "subversives," which by definition included German Jews residing in Italy. Pursuant to this agreement, the German State Secret Police (the "Gestapo") could compel the Italian police to interrogate, arrest and expel any German Jewish refugee. (See id. ¶ 25.) On November 1, 1936, Mussolini publicly announced the ratification of the Rome-Berlin Axis. During the summer and fall of 1937, the head of the Italian Police, Arturo Bocchini, and Mussolini accepted a proposal from the notorious General Reinhard Heydrich, the chief of the

Security Service of the Reichsführer (the "SS") and the Gestapo, to assign a member of the German police to police headquarters in various cities including Florence, where the Leffmanns resided. This facilitated the Nazi efforts to check on "subversives." (See id. ¶ 26.)

By the fall of 1937, anti-Semitism in Italy dashed any illusions about a longer stay in Italy for the Leffmanns. That fall, Germany and Italy began to prepare for Hitler's visit to Italy. In October, the Ministry of the Interior created lists of all German refugees residing in Italy's various provinces. The lists were intended to draw clear distinctions between "those who supported the Nazi regime" and "anti-Nazi refugees" or Jews. This was the first time that the Italian Government had explicitly associated all German Jews with anti-Nazi Germans. This marked a turning point in the 1936 Italo-German Police Agreement, with the Gestapo requesting these lists so that it could monitor "subversives" in anticipation of Hitler's visit. From the beginning of January 1938 until Hitler's visit in May, the Gestapo received a total of 599 lists from the police throughout Italy's provinces. (See id. ¶ 27.)

As the situation grew increasingly desperate for Jews living in Italy, it became clear that it would only be a matter of time before the Fascist regime's treatment of Jews would mimic that of Hitler's Nazis. Paul and Alice had to make plans

to leave, and this would require money.  They wanted to go to Switzerland to escape the horrors of Nazism and Fascism and find a truly safe haven.  But, as was well known at the time, passage into Switzerland did not come easily or cheaply.  Given the urgency of their situation, Paul began to explore the possibility of selling his masterpiece, The Actor, with dealers in Paris.  The events following the Austrian Anschluss and Hitler's visit to Italy in May 1938 confirmed that they would have had no choice but to turn whatever assets they still controlled into cash.  (See id. ¶ 28.)

Meanwhile, conditions for Jews in Italy grew worse.  On February 17, 1938, every newspaper in Italy published a Government announcement ("Diplomatic Notice Number 18," issued on February 16), which stated that "[t]he Fascist Government reserves to itself the right to keep under close observation the activity of Jews newly arrived in our country."  (See id. ¶ 29.) In March 1938, SS General Heydrich traveled to Rome to meet with the head of the Italian Police, Bocchini, in order to plan for Hitler's visit.  Nazi police officials were posted at thirteen Police Headquarters in border towns, ports, and large cities to conduct interrogations and house searches.  These officials, dressed in Nazi uniforms, arrived on April 10-11, 1938.  Id. Meanwhile, on March 18, 1938, the Italian Ministry of the Interior informed prefects in border provinces that "ex-Austrian

Jewish subjects" should be denied entry into Italy.  (See id.
¶ 30.)

In April 1938, in the face of the growing Nazi persecution
spreading across Europe and into Italy, Paul escalated his
efforts to liquidate The Actor.  (See id. ¶ 32.)  In September
1936, after they had been forced by the Nazis to part with
nearly everything they owned, the Leffmanns had rejected an
offer to sell The Actor from the notorious art dealer, C.M. de
Hauke of Jacques Seligmann & Co. (whom the U.S. State Department
later identified as a trafficker in Nazi-looted art).  (See id.
¶ 32.)  Nearly two years later, on April 12, 1938, the
Leffmanns, in an even more desperate state, reached out to de
Hauke asking him if he would be interested in purchasing the
Painting.  (See id.)

Just days after writing to de Hauke, the situation in Italy
grew even worse.  From April 24-26, General Heydrich, SS
Reichsführer Heinrich Himmler (whom Hitler later entrusted with
the planning and implementation of the "Final Solution") and SS
General Josef "Sepp" Dietrich, the commander of Hitler's
personal army, went to Rome to complete preparations for
Hitler's visit.  For three weeks in April and May 1938, there
were over 120 Gestapo and SS officers in Italy—primarily in
Florence, Rome, and Naples.  The Gestapo officials and Italian
police continued investigations and surveillance of "suspicious

persons" until the end of Hitler's visit, arresting at least 80 people in Florence. The Italian police carried out the arrests. Many German Jewish residents fled in anticipation of and as a result of these arrests. (See id. ¶ 34.)

On May 3, Adolf Hitler arrived in Italy for his official state visit. The Italian people turned out in the tens of thousands to greet the German leader. From May 3 through May 9, 1938, Hitler traveled to Rome, Naples, and Florence. The streets of these Italian cities were covered in thousands of Nazi swastika flags, which flew alongside Italy's tricolor. Flowerbeds were decorated in the shape of swastikas and photographs of Mussolini and Hitler were made into postcards and displayed in shop windows. Parades and military displays in honor of Hitler, attended by thousands of Italians, young and old, took place in every city he visited. In Florence, the last city visited by Hitler on May 9th, city officials made an official postmark that commemorated Hitler's visit. Mail sent during that time was stamped "1938 Il Führer a Firenze" and decorated with swastikas. (See id. ¶ 35.)

For the Leffmanns, the time to flee Italy was quickly approaching, so they continued to try to sell the Painting through de Hauke. Trying to raise as much cash as possible for the flight, the Leffmanns responded to a letter from de Hauke, telling him that they had already rejected an offer obtained

through another Paris dealer, Käte Perls, for U.S. $12,000 (net of commission). It is clear from the letter that the Leffmanns were desperately trying to improve their leverage to maximize the amount of hard currency they could raise. (See id. ¶ 36.)

Violence was increasing, and the persecution of Jews was on the rise. Foreign Jews in Italy risked arrest and had reason to fear possible deportation and death. The Leffmanns were in fear of their liberty and their lives. Just days after telling de Hauke that they had rejected Mrs. Perls' low offer, in late June 1938, the Leffmanns sold the Painting at the very price they told Perls and de Hauke they would not consider. They finally accepted Käte Perls' offer of U.S. $13,200 (U.S. $12,000 after a standard ten percent selling commission), who was acting on behalf of her ex-husband, Hugo Perls, also an art dealer, and art dealer Paul Rosenberg, with whom Perls was buying the Painting. (See id. ¶ 37.)

On July 26, 1938, Frank Perls, Käte's son (who was also a dealer) wrote to automobile titan Walter P. Chrysler Jr., asking if he would be interested in purchasing The Actor. Having just acquired a Picasso masterpiece from a German Jew on the run from Nazi Germany living in Fascist Italy for a low price that reflected the seller's desperate circumstances and the extraordinary prevailing conditions, Frank Perls misrepresented

to Chrysler that the Painting was purchased by Mrs. Perls from "an Italian collector." (See id. ¶ 38.)

In July 1938, the Leffmanns submitted their "Directory of Jewish Assets" forms detailing all of their assets, which the Reich required all Jews (even those living abroad) to complete. The penalties for failing to comply with this requirement included fines, incarceration, prison, and seizure of assets. (See id. ¶ 39.) Meanwhile, the plight of the Jews in Italy worsened. In August 1938, enrollment of foreign Jews in Italian schools was prohibited. A Jewish census, in which the Leffmanns were forced to participate, was conducted in preparation for the Italian racial laws, which were soon to follow. A legal definition of what constituted a "Jew" was considered, and discriminatory legislation was drafted. The Italian government increased surveillance of Jews because of the fear that Jews would transfer their assets out of Italy or emigrate and take their assets with them. A series of anti-Semitic publications was released, among them the infamous "Manifesto degli scienziati razzisti" ("Manifesto of the Racial Scientists"), which attempted to provide a scientific justification for the coming racial laws, and the venomous magazine, "La difesa della razza" ("The Defense of the Race"). In addition, a number of regional newspapers published lists of many of the names of Jewish families residing in Florence. (See id. ¶ 40.)

On September 7, 1938, the first anti-Semitic racial laws were introduced in Italy, including "Royal Enforceable Decree Number 1381," which was approved by the Council of Ministers on September 1st and was published in daily newspapers on September 2nd. With this Enforceable Decree, all "alien Jews" were forbidden from residing in Italy. All Jews who arrived in Italy after January 1, 1919 had to leave Italy within six months (i.e., by March 12, 1939) or face forcible expulsion. Bank accounts opened in Italy by foreign Jews were immediately blocked. (See id. ¶ 41.)

The Leffmanns were desperate and prepared for immediate departure. Switzerland, which already had strict border controls, became even more difficult to enter beginning in 1938. Following the incorporation of Austria into the Reich, Switzerland imposed visa requirements on holders of Austrian passports on March 28, 1938. In April, the Swiss government began negotiations with the Germans regarding the introduction of the notorious "J" stamp. On August 18-19, 1938 the Swiss decided to reject all refugees without a visa. On October 4, 1938, with an agreement reached on the adoption of the "J" stamp, they imposed visa requirements on German "non-Aryans." Receiving asylum was virtually impossible, and German and Austrian Jews could only enter Switzerland with a temporary residence permit. Given the strict controls and asset

requirements imposed by the Swiss government, these permits were not easy to obtain. (See id. ¶ 42.)

Sometime before September 10, 1938, however, the Leffmanns managed to obtain a Toleranzbewilligung (a tolerance or temporary residence visa) from Switzerland, valid from September 10, 1938 to September 10, 1941. In October 1938, just days after the enactment of the racial laws expelling them from Italy, the Leffmanns fled yet again, this time to Switzerland, where they were allowed to stay only temporarily. (See id. ¶ 43.) By the time the Leffmanns arrived in Switzerland, the Anschluss and other persecutory events had triggered a rising wave of flight from the Reich. Consequently, Swiss authorities required emigrants to pay substantial sums through a complex system of taxes and "deposits" (of which the emigrant had no expectation of recovery). (See id. ¶ 44.)

In October 1938, all German Jews were required to obtain a new passport issued by the German government stamped with the letter "J" for Jude, which definitively identified them as being Jewish. As German citizens who required a passport to continue their flight, the Leffmanns had no choice but to comply. (See id. ¶ 45.) The Leffmanns temporarily resided in Bern, Switzerland, but, unable to stay, prepared to flee yet again, this time to Brazil. In addition to bribes that were typically required to obtain necessary documentation, Brazil would only

provide visas for Jews who could transfer more than 400 contos (USD $20,000) to the Banco do Brasil. On May 7, 1941, the Leffmanns, still on the run, immigrated to Rio de Janeiro, Brazil, where they lived for the next six years. But even in Brazil, they could not escape the effects of the ongoing war. All German residents living there, including the Leffmanns, were forced to pay a levy imposed by the Brazilian government of 20,000 Swiss Francs ("SF") (or about U.S. $4,641). (See id. ¶ 46.)

Given the various payments required by Switzerland, as well as those that the Leffmanns would need to enter Brazil, the Leffmanns depended on the $12,000 (or approximately SF 52,440 in 1938) they received from the sale of The Actor, as it constituted the majority of the Leffmanns' available resources in June 1938. Had the Leffmanns not fled for Brazil when they did, they likely would have suffered a much more tragic fate at the hands of the Nazi regime and its allies. (See id. ¶ 47.)

The Leffmanns were not able to return to Europe until after the War had ended. In 1947, they settled in Zurich, Switzerland. (See id. ¶ 48.) Paul Leffmann died on May 4, 1956 in Zurich, Switzerland at the age of 86. (See id. ¶ 49.) He left his entire estate to his wife, Alice Brandenstein Leffmann. (See id. ¶ 49.) Alice Leffmann died on June 25, 1966 in Zurich,

Switzerland at the age of 88. She left her entire estate to 12 heirs (all relatives or friends). (See id. ¶ 50.)

The immediate history of the Painting after Perls and Rosenberg purchased it in June of 1938 is unclear, but it is known that after the purchase, art dealer Paul Rosenberg loaned the Painting to the Museum of Modern Art ("MoMA") in New York in 1939. In the paperwork documenting the loan, Rosenberg requested that MoMA insure the Painting for $18,000 (a difference of $6,000, or a 50 percent increase over what had been paid to the Leffmanns less than a year earlier). (See id. ¶ 52.) Sometime prior to October 28, 1940, the Painting was consigned for sale by Rosenberg to the well-known M. Knoedler & Co. Gallery in New York, New York. On November 14, 1941, M. Knoedler & Co. sold the Painting to Thelma Chrysler Foy ("Foy") for $22,500 (a difference of U.S. $9,300, or a 70 percent increase from the price paid to the Leffmanns). (See id. ¶ 53.) Thelma Chrysler Foy donated the Painting to the Museum in 1952, where it remains today. The Museum accepted this donation. (See id. ¶ 54.)

The Museum's published provenance for the Painting was manifestly erroneous when it first appeared in the Museum's catalogue of French Paintings in 1967. Instead of saying that the Leffmanns owned the Painting from 1912 until 1938, it read as follows: "P. Leffmann, Cologne (in 1912); a German private

collection (until 1938) . . . ," thus indicating that the
Leffmanns no longer owned the Painting in the years leading up
to its sale in 1938.  (See id. ¶ 57.)  This remained the
official Museum provenance for the Painting for the next forty-
five years, including when it was included on the Museum's
website as part of the "Provenance Research Project," which is a
section of the website that includes all artworks in the
Museum's collection that have an incomplete Nazi-era provenance.
(See id. ¶ 58.)  From 1967 to 2010, the provenance listing was
changed numerous times.  It continued to state, however, that
the Painting was part of a German private collection and not
that the Leffmanns owned it continuously from 1912 until 1938.
(See id. ¶ 59.)

In connection with a major exhibition of the Museum's
Picasso holdings in 2010 entitled, "Picasso in the Metropolitan
Museum of Art," the Museum changed the provenance yet again.
(See id. ¶ 60.)  Despite purported careful examination, as of
2010, the provenance of the Painting continued erroneously to
list the "private collection" subsequent to the Leffmanns'
listing.  In October 2011, only after extensive correspondence
with Plaintiff, the Museum revised its provenance yet again.
The revised provenance omitted the reference to the private
German collector who had purportedly owned The Actor from 1913-
1938 and finally acknowledged the Leffmanns' ownership through

1938 and their transfer of it during the Nazi era.  (See id.
¶ 63.)

On or about August 26, 2010, Nicholas John Day, the
Executor named in the will of Alice Anna Berta Brandenstein, a
legatee named in the will of Alice Leffmann, submitted a
Petition for Ancillary Probate for the estate of Alice Leffmann
in the Surrogate's Court of the State of New York, New York
County ("Surrogate's Court"), authorizing Laurel Zuckerman to
receive Ancillary Letters of Administration CTA of the estate.
On October 18, 2010, Laurel Zuckerman received Ancillary Letters
of Administration CTA and was named Ancillary Administratrix by
the Surrogate's Court of the State of New York, New York County.
(See id. ¶ 51.)

On September 8, 2010, Plaintiff's attorneys, Herrick
Feinstein LLP, wrote to the General Counsel of the Museum,
demanding the return of the Painting.  The Museum refused to
deliver the Painting to Plaintiff.  The Painting remains in the
possession of the Museum.  (See id. ¶ 66.)  On February 7, 2011,
the parties entered into a standstill agreement tolling any
statute of limitations as of February 7, 2011.  Such agreement
was thereafter amended several times to terminate on September
30, 2016.  The final amendment of the standstill agreement
terminated on September 30, 2016.  (See id. ¶ 67.)

## II. **LEGAL STANDARD**

In considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must "accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." Phelps v. Kapnolas, 308 F.3d 180, 184 (2d Cir. 2002)(citation and internal quotation marks omitted). Though a court must accept all factual allegations as true, it gives no effect to "legal conclusions couched as factual allegations." Stadnick v. Vivint Solar, Inc., 861 F.3d 31, 35 (2d Cir. 2017) (quoting Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. This "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citations omitted). Deciding whether a complaint states a claim upon which relief can be granted is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Rahman v. Schriro, 22 F. Supp. 3d 305, 310 (S.D.N.Y. 2014)(quoting Iqbal, 556 U.S. at 679).

## III. **DISCUSSION**

Plaintiff asserts claims for replevin and conversion and seeks a declaration that the Leffmann estate is the rightful owner of the Painting and that, as Ancillary Administratrix of the Leffmann estate, she is entitled to immediate possession of the Painting. (Am. Compl. ¶¶ 68-82.) In doing so she relies on the Italian law principles of (1) duress and (2) public order and public morals. (See Pl. Mem. of Law in Opp. to Def. Mot. to Dismiss, ("Pl. Opp."), dated Jan. 20, 2017 [dkt. No. 17].)

The Museum moves to dismiss, arguing that under either Italian law or New York law, Plaintiff has not adequately alleged duress and that, even under Italian law, the Leffmanns' sale of the Painting did not violate public order or public morals. (See Reply Br. in Further Supp. of Def. Mot. to Dismiss, ("Def. Rep."), dated Feb. 27, 2016 [docketed Feb. 27, 2017][dkt. no. 21].) The Museum also argues other bases for dismissal, including ratification, statute of limitations, and latches. (Def. Mot. at 13-19.)

### A. Standing

In its moving papers, the Museum argued that Plaintiff lacks standing to bring this suit on the grounds that the New York County Surrogate's Court Decree that appointed Plaintiff as

Ancillary Administratrix of the Leffmann estate was defective and should be vacated. (See Def. Mot. at 7-9.) At oral argument, however, after additional developments in the Surrogate's Court, the Museum conceded that Plaintiff has standing. Accordingly, that portion of the Museum's motion based on lack of standing is denied as moot.

## B. Choice-of-Law

Jurisdiction in this case is predicated on diversity of citizenship, and therefore New York's choice-of-law rules apply. Bakalar v. Vavra, 619 F.3d 136, 139 (2d Cir. 2010) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). "Under New York choice-of-law rules, the first inquiry in a case presenting a potential choice-of-law issue is whether there is an actual conflict of laws on the issues presented." Fed. Ins. Co. v. Am. Home Assurance Co., 639 F.3d 557, 566 (2d Cir. 2011) (citation omitted). The court will not engage in the choice-of-law analysis if there is no actual conflict. See id. However, where an actual conflict exists, New York courts give controlling effect to the law of the jurisdiction having "the greatest concern with the specific issue raised." Loebig v. Larucci, 572 F.2d 81, 84 (2d Cir. 1978).

Here, the Court turns to the threshold question of whether there is a difference between the laws of Italy and New York upon which the outcome of the case is dependent. Bakalar, 619 F. 3d at 139. In determining the law of a foreign country:

> Rule 44.1 of the Federal Rules of Civil Procedure allows a court to determine the content of foreign law based on 'any relevant material or source . . . whether or not submitted by a party.' However, it does not require a court 'to undertake its own analysis to determine' the content of foreign law.

Shld, LLC v. Hall, No. 15 CIV. 6225 (LLS), 2017 WL 1428864, at *4 (S.D.N.Y. Apr. 20, 2017) (quoting In re Nigeria Charter Flights Contract Litig., 520 F. Supp. 2d 447, 458 (E.D.N.Y. 2007). Additionally, "[t]he Court's determination must be treated as a ruling on a question of law." Ennio Morricone Music Inc. v. Bixio Music Grp. Ltd., No. 16-CV-8475 (KBF), 2017 WL 5990130, at *3 (S.D.N.Y. Oct. 6, 2017).

Rule 44.1 therefore "has two purposes: (1) to make a court's determination of foreign law a matter of law rather than fact, and (2) to relax the evidentiary standard and to create a uniform procedure for interpreting foreign law." In re Vitamin C Antitrust Litig., 837 F.3d 175, 187 (2d Cir. 2016); see also Rationis Enters. Inc. v. Hyundai Mipo Dockyard Co., 426 F.3d 580, 585 (2d Cir. 2005).

In support of their respective positions, both parties submitted expert reports regarding Italian law. Plaintiff's expert is Professor Marco Frigessi. (See Decl. of Prof. Marco Frigessi Di Rattalma ("Frig.")[dkt. no. 18].) Defendant's expert is Professor Pietro Trimarchi. (See Decl. of David W. Bowker Ex. 1, "Decl. of Prof. Pietro Trimarchi," ("Tri.")[dkt. no. 22-1].) After examining both parties' declarations, the Court concludes that insofar as it impacts the outcome of this case, New York and Italian law do not differ on the issue of duress. Because Plaintiff argues that there is an outcome-determinative difference between New York and Italian law, the Court will also undertake a choice-of-law analysis.

### i.   Italian Law

The Court credits the expert opinion of Professor Trimarchi in finding that Italian law, like New York law, requires a party alleging duress to plead and prove "a specific and concrete threat of harm" that "induced the victim to enter into a contract that would not otherwise have been concluded." (See Tri. ¶¶ 13, 26.) Both Plaintiff's and Defendant's experts rely on the 1865 Italian Civil Code ("Code") as the legal authority for duress under Italian law, which was in force at the time of the 1938 transaction and was replaced in 1942 by a new Civil

Code with "[s]imilar provisions." (<u>See</u> Frig. ¶¶ 6-8, 15-18, 41;

<u>See</u> Tri. ¶¶ 8, 10.) In defining duress, Article 1108 of the

Code provides that "consent is not valid if it was given by

mistake, extorted by duress ('violenza'), or obtained by fraud."

(Tri. ¶ 11; <u>See</u> Frig. ¶ 41.) "In this provision the word

<u>Violenza</u> (i.e. 'duress') means the threat of unjust harm made in

order to force a person to enter into a contract, which

otherwise would not have been concluded." (Tri. ¶ 12.) The

"threat of unjust harm" includes "the fear induced by a <u>specific</u>

<u>and concrete threat of harm, purposefully presented by its</u>

<u>author</u> to extort the victim's consent." (Tri. ¶ 13) (emphasis

added). A general state of fear arising from political

circumstances is not sufficient to allege duress:

> For duress to have legal significance as a vitiation of
> consent that invalidates a legal transaction, it must
> be a determinative cause of the transaction.
>      The generic indiscriminate persecutions of fascism
> . . . do not constitute legally significant duress
> pursuant to Art. 1108 of the 1865 Civil Code . . . when
> there is no specific, direct relationship between these
> persecutions and the legal transaction alleged to have
> been carried out under this act of duress.

(Tri. Ex. 3) (translating Corte di Appello, 9 aprile-31 agosto

1953, Rassegna Mensile Dell'Avvocatura Dello Stato 1954, IV,

sez. I civ., 25 et seq. (It.)).

Here, Plaintiff's allegation that Leffmann "was forced by

the <u>circumstances</u> in Fascist Italy to sell" the Painting in 1938

is insufficient to plead duress. (See Am. Compl. ¶ 9) (emphasis added). Plaintiff's allegation does not demonstrate a "specific and concrete threat of harm" beyond the "generic indiscriminate persecutions of fascism" and thus fails to meet the pleading standard for duress under Italian law. (Tri. Ex. 3.)

Plaintiff further alleges that the 1938 transaction is void under Italian principles of "public order" and "public morals." (See Pl. Opp. 22; see Frig. ¶¶ 15-38.) The Court disagrees and credits Professor Trimarchi's definition: "Public order and public morals are subsidiary rules aimed at completing the legal system with rules to be applied to prevent illicitness in situations not expressly regulated by code or statute." (See Tri. ¶ 62(c).)

Specifically, contracts violate public morals or public order "when the performance that is bargained for is illicit (e.g. hiring someone to commit a crime)." (See Tri. ¶ 52.) Here, the performance bargained for was the sale of a painting in exchange for U.S. $12,000 (net of commission). (See Am. Compl. ¶ 36.) The contract did not seek an illicit objective and therefore is not akin to a contract deemed void on the grounds of public morals or public order such as one where "spouses agreed to release themselves from the civil obligation of fidelity." (See Tri. ¶ 52 n.30.)

Plaintiff further argues, citing principles of public morals and public order, that the Italian legal system "would not recognize the validity of a contract" where, as here, the "circumstances involve the Holocaust—a context not lost on the Italian legal system which developed a specific set of post-War rules providing for particularly strong protections of Jewish individuals persecuted by the anti-Semitic laws." (Pl. Opp. 22-23.) Plaintiff's expert cites to one such "post-War rule," Article 19 ("Article 19") of legislative decree lieutenant April 12, 1945, no. 222. (See Frig. ¶ 35 n.14) (citing Decreto Legge 12 aprile 1945, n.222, G.U. May 22, 1945, n.61 (It.)). Article 19 states that "rescission is allowed" for "sales contracts stipulated by people affected by the racial provisions after October 6, 1938—the date when the directives on racial matters issued by the former regime were announced" and only where the claimant could prove a certain level of damages. (See id.) (emphasis added); (see also Tri. ¶ 47.) The transaction at issue took place in June, 1938, failing to meet the "after October 6, 1938" criteria established under Article 19. (See Am. Compl. ¶ 62.) Therefore, under Article 19, Plaintiff's claim for "rescission" would fail.

Even Plaintiff's expert acknowledges that under the Italian legal system, "[t]he principle of the voidness of contracts which are immoral or contrary to public order performs the role

of a _subsidiary rule_ with respect to the prohibitions established by the Civil Code." (Frig. ¶ 19) (citing Francesco Ferrara, Teoria del negozio illecito nel diritto civile italiano, 1902, Milano page 296) (emphasis added). Professor Frigessi, like Professor Trimarchi, states that the passage of Article 19 "shows that the Italian legal system developed a specific policy and specific rules protecting Jewish individuals affected by anti-Semitic laws who sold goods under such dire circumstances." (Frig. ¶ 35; Tri. ¶¶ 57-62.) Therefore, by admission of Plaintiff's expert, the Italian legal system considered the issue of Jewish individuals as weak contracting parties during the Holocaust and declined to extend the protections of Article 19 to transactions prior to October 6, 1938. Id. Because "public order performs the role of a _subsidiary rule_," this Court declines to extend its boundaries under Italian law to encompass a transaction that the Italian legal system opted not to include under Article 19. (Frig. ¶ 19; Tri. ¶¶ 57-59) (emphasis added). Accordingly, the 1938 transaction would not be subject to rescission under Italian law.

### ii. New York Law

Under New York law, "to void a contract on the ground of economic duress," Plaintiff must plead and show that the 1938

transaction "was procured by means of (1) a wrongful threat that (2) precluded the exercise of its free will." Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n, 655 F.3d 136, 142 (2d Cir. 2011); see Stewart M. Muller Constr. Co. v. N.Y. Tel. Co., 40 N.Y.2d 955, 956 (1976); see also Kramer v. Vendome Group LLC, 11 Civ. 5245, 2012 WL 4841310, at *6 (S.D.N.Y. Oct. 4, 2012) ("To prove economic duress, a party seeking to void a contract must plausibly plead that the release in question was procured by (1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative.").

In characterizing a "wrongful threat," New York "law demands threatening conduct that is wrongful, i.e., outside a party's legal rights." Interpharm, 655 F.3d at 142 (internal quotation marks and citation omitted). "Critically," under New York law, the defendant must have caused the duress. See Mandavia v. Columbia Univ., 912 F. Supp. 2d 119, 127-28 (S.D.N.Y. 2012), aff'd, 556 F. App'x 56 (2d Cir. 2014) (quoting Kramer, 2012 WL 4841310, at *6) (stating that "to prove duress, a plaintiff must demonstrate that the difficult circumstances" or wrongful threat "she faces are a result of the defendant's actions . . . to constitute duress, a defendant's actions must have amounted to threats that preclude[d] the exercise of [a plaintiff's] free will").

31

Moreover, courts have noted that "an element of economic duress is . . . present when many contracts are formed." VKK Corp. v. Nat'l Football League, 244 F.3d 114, 123 (2d Cir. 2001). For that reason, a party seeking to void a contract on the basis of economic duress bears a heavy burden. Davis & Assocs., Inc. v. Health Mgmt. Serv., Inc., 168 F. Supp. 2d 109, 114 (S.D.N.Y. 2001); Bus. Incentives Co. v. Sony Corp. of Am., 397 F. Supp. 63, 69 (S.D.N.Y. 1975)("Mere hard bargaining positions, if lawful, and the press of financial circumstances, not caused by the defendant, will not be deemed duress.") (emphasis added). Additionally, pressure exerted from general economic conditions is not enough to allege duress. See Mfrs. Hanover Tr. Co. v. Jayhawk Assocs., 766 F. Supp. 124, 128 (S.D.N.Y. 1991) (rejecting a defense of economic duress in connection with a refinancing agreement where defendants claimed to be under "economic pressure in general" but failed to show any duress at the hands of plaintiff).

Here, first, Plaintiff is unable to plead "a wrongful threat" by the Defendant Museum or the counterparties to the 1938 transaction. Specifically, Plaintiff does not plead that Käte Perls, Hugo Perls or Paul Rosenberg, respectively the negotiator and purchasers on the other side of the Leffmann transaction, or the Museum used "wrongful" or "threatening conduct . . . outside [their] legal rights" in effectuating the

32

1938 sale. Rather, Plaintiff states that "but for the Nazi and Fascist persecution to which [the Leffmanns] had been . . . subjected," they "would not have disposed of this seminal work at that time." (Am. Compl. ¶ 3.) Effectively, Plaintiff claims that the "circumstances in Fascist Italy," not the counterparties to the 1938 transaction or the Museum, forced the Leffmanns to sell the Painting under duress. (Am. Compl. ¶¶ 3, 9.) However, the 1938 transaction occurred between private individuals, not at the command of the Fascist or Nazi governments. As in Bakalar, "there is no . . . evidence that the Nazis ever possessed the [Painting], and therefore . . . this Court cannot infer duress based on Nazi seizure." Bakalar v. Vavra, 819 F. Supp. 2d 293, 300 (S.D.N.Y. 2011), aff'd, 500 F. App'x 6 (2d Cir. 2012), cert. denied sub nom. Vavra v. Bakalar, 569 U.S. 968 (2013). Thus, although the Leffmanns felt economic pressure during the undeniably horrific circumstances of the Nazi and Fascist regimes, that pressure, when not caused by the counterparties to the transaction (or the Defendant) where the duress is alleged, is insufficient to prove duress with respect to the transaction. Id.

Second, Plaintiff fails to plead that the Leffmanns entered into the 1938 transaction by force that "preclude[ed] the exercise of [their] free will." Orix Credit All., Inc. v. Bell Realty, Inc., No. 93 CIV. 4949, 1995 WL 505891, at *4 (S.D.N.Y.

Aug. 23, 1995) (quoting <u>Austin Instrument v. Loral Corp.</u>, 324
N.Y.S.2d 22, 25 (N.Y. Ct. of App. 1971)). Rather, Paul Leffmann
exercised his free will in "explor[ing] the possibility of
selling his masterpiece, The Actor, with dealers in Paris."
(<u>See</u> Am. Compl. ¶ 28.) The Leffmanns took nearly two years from
the time they received an initial offer to sell the Painting in
September, 1936, until they negotiated for its sale in June,
1938. (<u>See</u> Am. Compl. ¶¶ 28, 32-33, 36.) In the interim, the
Painting was in Switzerland for safekeeping. (<u>See</u> Am. Compl.
¶ 14.)

Additionally, the Leffmanns negotiated with several parties
prior to the 1938 transaction, rejected offers from other
dealers, and attempted to "improve [their] leverage to maximize"
the sale price before ultimately accepting an offer from Perls
and Rosenberg, the proceeds of which the Leffmanns retained and
used in later years. (<u>See</u> Am. Compl. ¶¶ 28, 32-33, 36-37, 47.)
Each transaction occurred between private individuals, not at
the behest of Nazi or Fascist officials. (<u>See</u> Am. Compl. ¶¶ 28,
32, 33, 36.) Accordingly, these allegations are fatal to a
claim of duress as Plaintiff is unable to show "a wrongful
threat by the <u>other party</u> which precluded the exercise of
[Paul's] free will in making the contract at issue." <u>Mfrs.
Hanover Tr. Co. v. Jayhawk Assocs.</u>, 766 F. Supp. 124, 128
(S.D.N.Y. 1991) (quoting <u>805 Third Ave. Co. v. M.W. Realty</u>

Assoc., 58 N.Y.2d 447, 451 (N.Y. 1983)) (internal quotation marks omitted) (emphasis added).

Third, Plaintiff fails to plead facts demonstrating that the Leffmanns had "no other alternative" than to engage in the 1938 transaction. Kramer v. Vendome Grp. LLC, No. 11 CIV. 5245, 2012 WL 4841310, at *6 (S.D.N.Y. Oct. 4, 2012). Plaintiff's assertion that the Leffmanns were "forced by the circumstances in Fascist Italy to sell [the Painting] under duress in 1938" conflates the Leffmanns' need "to raise as much cash as possible" with the Leffmanns having "no other alternative." (See Am. Compl. ¶¶ 9, 36.) The fact that the Leffmanns spent several years looking to sell the Painting, rejected other offers, and had additional assets including properties in Italy that they sold to an Italian businessman in 1937, suggests that they had other financial alternatives. (See Am. Compl. ¶¶ 9, 28, 32-33, 36.) Accordingly, the Court finds that there is no outcome-determinative difference between Italian law and New York law; Plaintiff's claims fail under both.

### iii. New York Choice-of-Law

Plaintiff argues that there is an outcome-determinative difference between New York law and Italian law. As explained above, the Court disagrees. In the alternative, to the extent Plaintiff might be correct, the Court will undertake a choice-

of-law analysis.  If a court has established that the outcome of the case is dependent upon a difference in the law of two jurisdictions, a federal district court in the Southern District of New York sitting in diversity must apply New York's choice-of-law rules.  Bakalar v. Vavra, 619 F.3d 136, 139 (2d Cir. 2010); Schoeps v. Museum of Modern Art & the Solomon R. Guggenheim Museum, 594 F. Supp. 2d 461, 465 (S.D.N.Y. 2009). Plaintiff and Defendant agree that New York applies an "interest analysis" to choice-of-law questions.  (See Pl. Opp. at 20; Def. Rep. at 4.)

Under New York conflict principles, "[t]he New York Court of Appeals has explicitly held that the New York interest analysis is not rigid, but rather is determined by 'an evaluation of the facts or contacts which related to the purpose of the particular law in conflict.'"  Abu Dhabi Inv. Auth. v. Citigroup, Inc., No. 12 CIV. 283 (GBD), 2013 WL 789642, at *6 (S.D.N.Y. Mar. 4, 2013), aff'd, 557 F. App'x 66 (2d Cir. 2014)(quoting Padula v. Lilarn Props. Corp., 84 N.Y.2d 519, 521 (1994)).  Interest analysis is a fact intensive "'flexible approach intended to give controlling effect to the law of the jurisdiction, which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.'"  Fin. One Pub. Co. v. Lehman Bros. Special Fin., 414 F.3d 325, 337 (2d Cir. 2005)

(quoting Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 72 (1993);
see Bakalar, 619 F.3d at 144 ("New York choice of law rules
require the application of an 'interest analysis,' in which 'the
law of the jurisdiction having the greatest interest in the
litigation [is] applied. . . ".)(quoting Karaha Bodas Co. v.
Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70,
85 (2d Cir. 2002)); see John v. Sotheby's, Inc., 858 F. Supp.
1283, 1289 (S.D.N.Y. 1994), aff'd, 52 F.3d 312 (2d Cir. 1995)
(citing J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.,
37 N.Y.2d 220, 226-27 (1975))("The Court will apply the laws of
the jurisdiction that has the greatest interest in, and is most
intimately concerned with, the outcome of a given litigation."
(emphasis added)).

In applying an interest analysis to the instant case, the
Court of Appeals' analysis in Bakalar is instructive.  Bakalar
centered on a dispute over the ownership of a drawing
("Drawing") by Egon Schiele.  619 F.3d at 137.  Originally owned
by Franz Friedrich Grunbaum ("Grunbaum") in Vienna in 1938,
heirs to the Grunbaum estate alleged that he was deprived of his
possession and dominium over the Drawing after being arrested by
the Nazis and signing a power of attorney to his wife, while
imprisoned at Dachau.  Id.  Grunbaum died in Dachau in 1941; his
wife died in a concentration camp in 1942.  Id. at 138-39.  The
Drawing was purchased along with forty-five other Schieles by

Galerie Gutekunst, a Swiss art gallery, in February and May of 1956. Id. at 139. Several months later, on September 18, 1956, the Drawing was purchased by the Galerie St. Etienne and was shipped to it in New York. Id. On November 12, 1963, the Galerie sold the drawing to David Bakalar. Id. The way in which the Drawing traveled from Vienna to Switzerland to Galerie St. Etienne, the New York art gallery from which Bakalar purchased it, is unclear, as there are no records of what became of the art collection after Grunbaum's arrest. Id. at 138.

As in the instant action, multiple jurisdictions had a logical claim for providing the relevant law in Bakalar: Austria, the situs of the initial alleged theft; Switzerland, where title was transferred in the 1950s; and New York, where the drawing was sold to a gallery and ultimately purchased by Bakalar in 1963. Id. at 146. Although the District Court and the Court of Appeals agreed that New York's choice-of-law rules governed, they came to differing conclusions. The District Court, relying on the traditional "situs rule," held that "[u]nder New York's choice of law rules, questions relating to the validity of a transfer of personal property are governed by the law of the state where the property is located at the time of the alleged transfer," which was Switzerland. Bakalar v. Vavra, 550 F. Supp.2d 548, 550 (S.D.N.Y. 2008) (quoting Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc., 1999 WL

673347, at *4-5 (S.D.N.Y. Aug.30, 1999)). Following a 2008
bench trial, judgement was entered for Bakalar. See Bakalar v.
Vavra, 2008 WL 4067335, at *9 (S.D.N.Y. 2008). Applying Swiss
law, the District Court found that the Swiss Galerie Gutekunst
had purchased the drawing in 1956 in "good faith" from Mathilde
Lukacs, the sister-in-law of Grunbaum, and therefore Galerie
Gutekunst had acquired good title to the Drawing. Id. As a
subsequent purchaser from the Swiss Galerie, the Court concluded
that Bakalar had also acquired good title to the Drawing. Id.

The Court of Appeals disagreed, finding that New York's
choice-of-law rules demanded the application of New York
substantive law, not Swiss law. The Court stated that choice-
of-law disputes regarding the validity of a transfer of personal
property are not governed by the "situs rule," which relies on
the location of the disputed property, or parties, at a given
point in time. Bakalar, 619 F.3d at 143. Rather, New York's
choice-of-law analysis is driven by the "interests" of affected
jurisdictions, not the location of events. The Court of Appeals
explained New York's choice-of-law approach this way:

> The problem with the traditional situs rule . . . is
> that it no longer accurately reflects the current
> choice of law rule in New York regarding personal
> property. This is demonstrated by our decision in
> Karaha Bodas Co., LLC v. Perusahaan Pertambangan Dan
> Gas Bumi Negara, 313 F.3d 70, 85 n.15 (2d Cir. 2002).
> The plaintiff there argued that "the law of the situs
> of the disputed property generally controls." Id. We
> declined to apply this rule because "the New York

> Court of Appeals explicitly rejected the 'traditional situs rule' in favor of interest analysis in Istim." Id. (citing Istim, Inc. v. Chemical Bank, 78 N.Y.2d 342, 346-47, (1991) . . . . "In property disputes, if a conflict is identified, New York choice of law rules require the application of an 'interests analysis,' in which 'the law of the jurisdiction having the greatest interest in the litigation [is] applied and . . . the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.'" Karaha Bodas, 313 F.3d at 85.

Bakalar, 619 F.3d at 143-44.

The Court concluded that it was New York, not Switzerland, that had the "greatest interest in the litigation" over the Drawing. Id. The "locus of the [alleged] theft was simply not relevant." Id. (citing Kunstsammlungen Zu Weimar v. Elicofon, 536 F. Supp. 829, 846 (E.D.N.Y. 1981)). Rather, New York had an interest in "preserv[ing] the integrity of transactions and, by having its substantive law applied, prevent[ing] the state from becoming a marketplace for stolen goods". Bakalar, 619 F.3d at 144 (emphasis omitted). Indeed, "if the claim of [Grunbaum's heirs] is credited, a stolen piece of artwork was delivered in New York to a New York art gallery, which sold it in New York to Bakalar." Id. The Court reasoned that these events "made New York a marketplace for stolen goods and, more particularly, for stolen artwork." Id. (internal quotation marks and citations omitted). Moreover, the Court stated that "[t]he application of New York law may cause New York purchasers of artwork to take

greater care in assuring themselves of the legitimate provenance of their purchase." Id. Therefore, "[h]owever the Drawing came into the possession of the Swiss art gallery, New York has a compelling interest in the application of its law." Id. In this way, New York had the "greatest interest in," and "is most intimately concerned with, the outcome" of, this litigation. See John v. Sotheby's, Inc., 858 F. Supp. 1283, 1289 (S.D.N.Y. 1994), aff'd, 52 F.3d 312 (2d Cir. 1995) (internal citations omitted).

By contrast, the Court found that Switzerland, where a portion of the Schiele collection had surfaced in the mid-1950s before being sold to a New York gallery, had only a "tenuous interest" in the litigation. Bakalar, 619 F.3d at 144. "The resolution of an ownership dispute in the Drawing between parties who otherwise have no connection to Switzerland does not implicate any Swiss interest simply because the Drawing passed through there." Id. Although "the Drawing was purchased in Switzerland by a Swiss art gallery," it was "resold [ ] within five months to a New York art gallery" where it remained for years. Id.

The facts of Bakalar are analogous to those in the present case. Here, as in Bakalar, New York has "the greatest interest in," and "is most intimately concerned with, the outcome" of, this litigation. Id.; Sotheby's, 858 F. Supp. at 1289 (emphasis

added).  Although the immediate history of the Painting after
Perls and Rosenberg purchased it in June 1938 is unclear, the
Painting has remained in New York since at least 1939, within
one year of the disputed 1938 transaction, when art dealer Paul
Rosenberg loaned it to MoMA located in New York.  (See Am.
Compl. ¶ 52.)  By October 1940, a well-known New York Gallery
consigned the Painting for sale and sold it on November 14,
1941, to Foy, a New York collector.  (See Am. Compl. ¶ 53.)  In
1952, Foy donated the Painting to the Museum, "a New York not-
for-profit corporation operating as a public museum located in
New York County, New York."  (See Am. Compl. ¶ 5.)  The
Defendant Museum, a major New York cultural institution,
possessed and exhibited the Painting for the past 66 years, all
in New York.  (See Am. Compl. ¶ 54.)

Just as the Court of Appeals in Bakalar held that Swiss
interests were not implicated by the mere fact of the painting's
passing through Switzerland before relocating to New York in
less than one year, this Court similarly finds the interests of
Italy "tenuous" when compared to those of New York.  Although
the Leffmanns were in Italy during the 1938 sale, they were not
Italian citizens and resided in Italy for only four months after
the sale, which took place in France, through a Parisian dealer
to French counter-parties.  (See Am. Compl. ¶ 2, 13-14, 36-37.)
Additionally, the Painting was never located in Italy, rather

the Leffmanns moved it "[s]ome time prior to their departure from Germany" to Switzerland, where it "was saved from Nazi confiscation or worse." (See Am. Compl. ¶ 14.)

Here, as in Bakalar, "the application of New York law may cause New York purchasers of artwork to take greater care in assuring themselves of the legitimate provenance of their purchase." Bakalar, 619 F.3d at 145. Therefore, "[t]he tenuous interest of [Italy] created by these circumstances, however, must yield to the significantly greater interest of New York, as articulated in Lubell and Elicofon, in preventing the state from becoming a marketplace for stolen goods." Id. (citing Elicofon, 536 F. Supp. at 846 (holding that "[u]nder New York law, in an action to recover converted property from a bona fide purchaser an owner must prove that the purchaser refused, upon demand, to return the property" and therefore, the statute of limitations did not begin to run until demand and refusal)).

Plaintiff's reliance on Schoeps v. Museum of Modern Art, 594 F. Supp. 2d 461 (S.D.N.Y. 2009), to support the position that Italian law should govern the 1938 transaction is misplaced. (See Pl. Opp. at 5, 15-16, 19-21.) Schoeps involved claims by Julius Schoeps and other heirs of Paul von Mendelssohn-Bartholdy ("Paul M.") and/or of his second wife, Elsa, that two Picasso paintings (collectively "the Picassos")— "Boy Leading a Horse" (1905-1906) ("Boy") and "Le Moulin de la

Galette" (1900)—once owned by Paul M. and held by, respectively, MoMA and the Solomon R. Foundation, were transferred from Paul M. and/or Elsa as a result of Nazi duress and rightfully belonged to one or more of the Claimants. Schoeps, 594 F. Supp. at 463. In 1933, Paul M. shipped five Picasso paintings to Switzerland where he sold them approximately one year later, allegedly under duress, for an unknown price. (See Compl. for Declaratory Relief at 11-12, Schoeps, 594 F. Supp. 2d 461 (S.D.N.Y. 2009)(No. 07-11074) [dkt. no. 1].) The purchaser of the Picassos, Justin Thannhauser, a Swiss art dealer, sold Boy to American collector William Paley, who ultimately donated it to MoMA in 1964. (Id. at 1-2.) Thannhauser held onto Le Moulin de la Galette before donating it to the Guggenheim Museum in New York in 1963, following his relocation to the United States. Id. The District Court held that under New York's choice-of-law rules, German law governed whether the transfer of the Paintings to Thannhauser was the product of duress. Schoeps, 594 F. Supp. at 465.

Plaintiff relies on the Court's holding in Schoeps stating, "[t]he Court determined that the law of Germany—where the transferors were located—governed this question even though there were other jurisdictions involved, including Switzerland, where, as here, the paintings may have been located." (Pl. Opp. at 21.) In reaching this conclusion, the District Court stated

that "New York applies <u>interest analysis</u> to choice-of-law
questions" but then described interest analysis using the "<u>five
factors</u>" which govern "contract dispute[s]." <u>Schoeps</u>, 594 F.
Supp. at 465 (emphasis added).  However, these five factors,
"including the place of contracting, the place of negotiation,
the place of performance, the location of the subject matter of
the contract, and the domicile or place of business of the
contracting parties" are the five factors of the "center of
gravity" test, <u>not</u> an "interest analysis."  <u>Id.</u>; <u>see</u> <u>Md. Cas.
Co. v. Cont'l Cas. Co.</u>, 332 F.3d 145, 151-52 (2d Cir. 2003)
(listing the five factors of the "center of gravity" test).
Therefore, by conflating the "center of gravity" test with an
"interest analysis," the District Court effectively created what
both Plaintiff and Defendant have called "a hybrid test."  (<u>See</u>
Pl. Opp. at 21; Def. Rep. at 5.)

In the instant case, the application of a "hybrid test" is
inappropriate, as the Court of Appeals has stated that an
"interest analysis," not an "interest analysis" combined with
the factors of a "center of gravity test," is what governs in
choice-of-law disputes regarding the transfer of personal
property.  <u>See</u> <u>Globalnet Financial.com, Inc. v. Frank Crystal &
Co.</u>, 449 F.3d 377, 384 (2d Cir. 2006).  "Under New York law
there are two different 'choice-of-law analyses, one for
contract claims, another for tort claims.'"  <u>Id.</u>; <u>See</u> <u>Granite</u>

Ridge Energy, LLC v. Allianz Glob. Risk U.S. Ins. Co., 979 F. Supp. 2d 385, 392 (S.D.N.Y. 2013) (citations omitted); see, e.g., Fin. One Pub. Co., 414 F.3d at 336. The Court of Appeals has established a clear distinction between the "center of gravity" approach and the "interest analysis" approach. Globalnet Financial.com, 449 F.3d at 384 ("[T]he relevant analytical approach to choice of law in tort actions in New York is the '[i]nterest analysis.'") (citation omitted); Benefield v. Pfizer Inc., 103 F. Supp. 3d 449, 457 (S.D.N.Y. 2015) ("For contract claims, New York courts apply the 'center of gravity' or 'grouping of contacts' choice of law theory.") (citation omitted); Winter v. Am. Inst. of Med. Scis. & Educ., 242 F. Supp. 3d 206, 218 (S.D.N.Y. 2017) ("New York maintains two choice-of-law tests—one for contract claims and one for tort claims.").

For contract claims in New York, the "center of gravity" test, traditionally known as the "situs" rule, makes use of five factors to determine which of two or more jurisdictions has the "most significant relationship" or "contacts" to a given contract dispute. Md. Cas. Co., 332 F.3d at 151-52. Under this test, a court considers five factors: (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile or place of business of

the contracting parties. Id. The five factors comprising the
"center of gravity" test are thus the same five factors the
District Court used in Schoeps to conduct what it called an
"interest analysis." The Court concluded without elaborating
that "[a]ll five of these factors plainly support the
application of German law to the issue of whether the transfer
of these German-held Paintings in 1935 was a product of Nazi
duress or the like." Schoeps, 594 F. Supp. at 465.

Plaintiff's reliance on the "hybrid test" in Schoeps is
misguided as the Court of Appeals explicitly stated that "the
conflation of the two tests is improper." Lazard Freres & Co.
v. Protective Life Ins. Co., 108 F.3d 1531, 1539 n.5 (2d Cir.
1997). Based on this "hybrid test," Plaintiff maintains that
"[t]he circumstances as to the [1938] sale are Italian-centric,"
and therefore, Italian law should govern the issue of duress in
this case. (Pl. Opp. at 21.) However, even examining the facts
of the 1938 transaction under the "center of gravity" factors
does not conclusively point to the application of Italian law
here. Parties in Italy and France negotiated and performed the
contract via letters, while the Painting remained in
Switzerland, not Italy. (See Am. Compl. ¶¶ 13, 14, 36.) Once
sold, the Painting traveled to France, purchased through a
Parisian dealer on behalf of French counter-parties. Id.
Although the Leffmanns resided in Italy at the time of the 1938

47

sale, New York courts have stated that the locus of the alleged injury is not dispositive in an "interest analysis." See Abu Dhabi Inv. Auth. v. Citigroup, Inc., No. 12-283, 2013 U.S. Dist. LEXIS 30214, at *23 (S.D.N.Y. Mar. 4, 2013) (stating that "[w]hile the place where the injury was felt is an important factor, it is not conclusive"); see Cummins v. Suntrust Captial Mkts., Inc., 649 F. Supp. 2d 224, 237 (S.D.N.Y. 2009). Thus, even under Plaintiff's "hybrid test" from Schoeps, French law, not Italian law, might well be applicable. In any event, the Court rejects this analysis as incorrect under New York choice-of-law rules.

Here, as in Bakalar, the interests of a European jurisdiction where one party to the transaction was temporarily passing through are "tenuous" when compared to those of New York. Bakalar, 619 F. 3d at 144-45. New York's interests surpass those of Italy, where, as here, the artwork was transferred to New York shortly after the 1938 transaction, was ultimately sold to a New York resident, and donated to a New York institution where it has remained, mostly on display to the public, since 1952. Moreover and consistent with Bakalar, New York has an interest in "preserv[ing] the integrity of transactions and prevent[ing] the state from becoming a marketplace for stolen goods" by having its substantive law applied. Id. For these reasons, under an "interest analysis,"

New York has the greatest interest in, and is most intimately concerned with, the outcome of this litigation.  Accordingly, under New York choice-of-law analysis, New York substantive law is applicable to the 1938 transaction.

### iv.   The Amended Complaint Fails to State a Claim

As set out in Part III.B.i and Part III.B.ii above, the Court finds no outcome-determinative difference between Italian and New York law and that under either law, Plaintiff fails to state a claim for relief.  Accordingly, dismissal is required under Fed. R. Civ. P. 12(b)(6).

In the alternative, as set out in Part III.B.iii above, to the extent that a difference is perceived between Italian and New York law, New York's choice-of-law analysis prescribes that New York law is applicable to the 1938 transaction.  As noted in Part III.B.ii above, Plaintiff fails to state a claim for relief under New York law.

## IV.  **CONCLUSION**

For the reasons discussed above, Defendant's Motion to Dismiss the Amended Complaint [dkt. no. 11] is granted.

The Clerk of Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED.

Dated:    New York, New York
          February 7, 2018

_Loretta A. Preska_
LORETTA A. PRESKA
Senior United States District Judge